T.C. Memo. 2000-68

UNITED STATES TAX COURT

FERYDOUN AHADPOUR, a.k.a. F. AHADPOUR, AND
DORIS AHADPOUR, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4843-96.                          Filed March 2, 2000.

William K. Norman, Edi Shawn Stiles, and E. O. C. Ord, for
petitioners.

Louis B. Jack, T. Ian Russell, Elizabeth Stetson, and Sherri
Wilder, for respondent.

MEMORANDUM OPINION

DAWSON, Judge:  This case was assigned to Special Trial

Judge Larry L. Nameroff pursuant to Rules 180, 181, and 183.[1]

---

[1]  Unless otherwise specified, all section references are to
the Internal Revenue Code in effect for the years in issue.  All
Rule references are to the Tax Court Rules of Practice and
Procedure.

The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

## OPINION OF THE SPECIAL TRIAL JUDGE

NAMEROFF, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes, additions to tax, and penalties as follows:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|------------|--------------------------------|----------------------|
| 1989 | $1,363,638 | $340,560 | $272,728 |
| 1990 | 303,274 | -- | 60,655 |
| 1991 | 237,234 | 60,864 | 47,447 |

Some of the issues in this case were severed for separate resolution and resolved in Ahadpour v. Commissioner, T.C. Memo. 1999-9.

The issues for decision herein are: (1) Whether petitioners are entitled to a claimed business bad debt deduction; (2) whether petitioners are entitled to deduct legal expenses of $30,000 in 1990 and $30,025 in 1991; (3) whether petitioners are liable for the accuracy-related penalty for all years at issue; and (4) whether petitioners are liable for additions to tax under section 6651(a)(1) for 1989 and 1991.

Some of the facts have been stipulated, and they are so found. The stipulations of facts and the attached exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners resided in Huntington Beach, California.

Background

Family History[2]

Petitioner Ferydoun Ahadpour (petitioner) was born in Tehran, Iran.  By two prior marriages, he has three children, Bahman (born December 12, 1954), Geila (born October 17, 1956), and Bijan (born September 12, 1965).  Petitioner met Doris Ahadpour (Mrs. Ahadpour), f.k.a Doris Peters and Doris Ashrafi, an American, in 1968.  Mrs. Ahadpour had been living in Iran since 1967.  During an 11-month visit to the United States in 1969, petitioners were married in Las Vegas, Nevada.  As a result of the marriage, Mrs. Ahadpour became an Iranian citizen while retaining her United States citizenship.

Three children were born of petitioners' marriage:  Diana (a.k.a. Deanna) on December 17, 1969, David on November 26, 1972, and Leila on June 3, 1980.  Petitioner's native language is Persian, and his English is limited.  Mrs. Ahadpour speaks Persian, but she cannot read it.  Typically, Mrs. Ahadpour interprets English for her husband.

The Marine Salvage Company in Iran

Prior to the mid-1950's, petitioner worked for the Iranian Government in the police department in Khorramshahr.  Around the mid-1950's, he heard that a barge transporting steel had sunk.

---

[2]  In view of our disposition of the issues presented herein, the issue of when petitioners established residency in the United States is moot.

Petitioner found out that there were many sunken barges in the rivers and in the Persian Gulf and believed that raising the barges and their cargoes could be profitable. Around 1956 or 1957, he purchased a barge and an old crane and mounted the crane on the barge. Petitioner purchased the rights to a sunken barge from the insurance company. With some hired help and the barge and crane, petitioner raised the sunken barge. This turned out to be a successful venture. Around 1958, he founded Gulf Divers, a marine salvage company which he operated out of Khorramshahr. In the next few years, Gulf Divers salvaged numerous sunken barges and their cargoes.

In subsequent years, the name of the business changed a few times. In 1968, the name of the business was changed to Persian Gulf Diving Joint Stock Co.; in 1973, it was changed to Persian Gulf Limited Liability Co.; and in 1975, it was changed for the last time to Gulf Marine Service Co. (GMS).[3] The name was changed to GMS so the business would not be associated only with diving, but also with a broader variety of marine operations such as dredging, underwater repairs, and construction.

---

[3] Hereinafter, the company is referred to as GMS for all time periods for simplicity.

Additionally, there is substantial evidence indicating that GMS was incorporated between 1968 and 1975, but the necessity for such determination is rendered moot by our disposition of the bad debt issue. Consequently, we need not consider petitioners' objections to the admission into evidence of excerpts from the publication known as the Official Gazette of the Islamic Republic of Iran.

Hossein Ammareh

Hossein Ammareh (Ammareh) was an employee at the National Iranian Oil Company (NIOC) located near Khorramshahr. Petitioner first met Ammareh in 1968. Ammareh had mechanical skills, and petitioner hired him to work for GMS. Ammareh speaks and writes Persian.

While petitioner was in the United States for 11 months in 1969 (and on his subsequent visits), Ammareh ran GMS without incident. In 1969, petitioner issued a power of attorney to Ammareh allowing him to sell some property and equipment while petitioner was out of Iran.[4]

Ammareh's responsibilities increased over the years. Ammareh signed contracts with NIOC on behalf of GMS. Petitioner often referred to Ammareh as his partner.

Operations of GMS

Initially, GMS was involved in diving and marine salvage operations. Throughout the years, the scope of GMS's business had increased to include dredging, jetty construction, placing pillars and pipes underwater, and the unloading of pipes. More equipment was purchased such as barges, pontoons, cranes,

---

[4] According to petitioner, Ammareh sold some of GMS's cranes. The power of attorney authorizes Ammareh to sell a piece of real estate for petitioner, and there is no mention of the business.

tugboats, and a warehouse. GMS also leased the cranes and equipment to other companies.

## Sale of GMS

Since petitioners were considering moving to the United States, petitioner claimed that during 1975 and 1976, he negotiated to sell GMS to Ammareh. At some point in 1976, petitioner and Ammareh allegedly orally agreed to the sale for a price of $8 million, which Ammareh allegedly would pay petitioner with money earned from the business. This sale was not evidenced by any written agreement. Petitioner did not report the sale on his 1976 Iranian tax return.

## Iran-Iraq War

War broke out between Iran and Iraq in September 1980 and lasted until 1988. Khorramshahr and surrounding areas were attacked by Iraqi air and ground forces. The city was captured by Iraq and was devastated. GMS's assets were largely destroyed as a result of the war.

## The "Fair Price Agreement"

In April 1979, Ammareh traveled to the United States, where he stayed with petitioners. Ammareh asked petitioner to sell the remainder of the business to him or to buy him out. On April 21, 1979, petitioner handwrote the following statement in Persian (as translated):

> On April 21, 1979, it was resolved between the undersigned that I, Ferydoun Ahadpour, sell all my 50

percent shares [saham], consisting of marine machineries and equipment and the storage land of the company [which] is in my name and in the name of my children, namely Mr. Bahman Ahadpour and Bijan and David Ahadpour, together with my personal storage which is presently used by the company to Mr. Amarreh at fair price and, as of this date, Mr. Amarreh is the owner of Gulf Marine Service Company and the cash and accounts receivable, as of this date, belongs to the company which exists between us and the contracts which are signed as of this date are all the company's income [and] belong to Mr. Amarreh and Mr. Amarreh, taking the God and conscience into consideration, purchases the above mentioned shares [saham] and pays the price thereof to me.[5]  God bless the parties.

Both Ammareh and petitioner signed this statement (fair price agreement).

Statement of Account

On April 30, 1979, petitioner and Ammareh met with attorney John Salyer (Mr. Salyer).  Mr. Salyer prepared a document in English entitled "Statement of Account".  Mrs. Ahadpour interpreted between Persian and English during the drafting of this document.  Both Ammareh and petitioner signed this document, which states:

That approximately three (3) years ago, on or about 1976, in the Country of Iran, FERYDOUN AHADPOUR, DORIS AHADPOUR and their dependent children, sold all their right, title and interest in and to GULF MARINE SERVICES, * * * to HOSSEIN AMMAREH by a separate contract and agreement for the amount of Eight (8) Million Dollars ($8,000,000) * * * .
That Two Million ($2,000,000) dollars of said purchase price has been paid by depositing said funds in a bank in Iran, and that the remaining balance of Six Million dollars ($6,000,000) will be paid by said HOSSEIN AMMAREH in

---

[5]  According to petitioner's translation of the document, the last portion of the sentence reads as "and will pay the price thereof to me."

intervals as agreed upon between the parties in the future, and all such future payments are to be made by depositing the funds in a bank in Iran to the account of FERYDOUN AHADPOUR.

Petitioners testified that they never received the $2 million from Ammareh. Petitioner stated that he signed the document based on Ammareh's oral promise that the funds had been transferred to a bank.

The Khossravi Appraisal

Ammareh went back to Iran shortly after signing the fair price agreement and Statement of Account. He had GMS's assets appraised by Mr. Hajet Khossravi (Mr. Khossravi), who appraised the assets at 85,600,000 rials (the Khossravi appraisal).[6] By letter dated May 10, 1979, Ammareh forwarded the Khossravi appraisal to petitioner.

Before the end of 1979, petitioner and Ammareh had angry conversations regarding the payment, and Ammareh refused to speak to petitioner.

Petitioner's United States Business Endeavors

In the United States, petitioner primarily became involved with real estate development and investments. In 1977, petitioners formed University Ranches, Inc. (URI). URI was solely owned by petitioners, and it engaged in a real estate

---

[6] The stipulated annual average exchange rate is 70.48 rials to one dollar. Therefore, under the Khossravi appraisal the assets were appraised at $1,214,529.

transaction with Djamsheed Parsa (Mr. Parsa), a real estate developer whereby petitioners acquired land for development in San Diego, California (San Diego project). Petitioners invested around $1 million in the San Diego project, and, according to Mr. Parsa, petitioner told him that the money came from "some company in Iran".

In the 1980's, petitioners acquired Huntington Harbor Bay and Racquet Club (Huntington Harbor), which was acquired through URI.

Petitioner's Collection Efforts in 1980

In 1980, petitioner hired an Iranian attorney, Dr. Manouchehr Haghighi (Dr. Haghighi), to contact Ammareh about the payments. According to a report prepared by Dr. Haghighi's associate dated February 16, 1980, Ammareh was uncooperative and refused to discuss the matter.

Expropriation Loss Claim

In 1984, petitioners' attorneys Michael McCaffrey (Mr. McCaffrey) and Allen Kroll (Mr. Kroll) researched whether petitioners could file a claim with the Iranian Claims Tribunal with respect to their property losses in Iran. Mr. Kroll contacted the U.S. Department of State which informed him that the period of limitations for filing claims with the Iranian Claims Tribunal had already expired. Petitioners' claim was for the expropriation of a business in Iran.

Petitioners did not file a claim with the Iranian Claims Tribunal because the Government of Iran did not expropriate GMS and a dispute between private parties is not heard by the Iranian Claims Tribunal.

Petitioners' Balance Sheets in the 1980's

In the early 1980's, petitioners' certified public accountant prepared a list of petitioners' assets and liabilities in connection with some estate planning work that he was conducting for them. The list did not include a receivable due from Ammareh or any receivable due from a sale of a business in Iran. In 1982, petitioners applied for a personal loan from Wells Fargo Bank. Petitioners did not list a receivable due from the sale of the Iranian business. In subsequent real estate applications and statements of financial condition prepared up to 1987, there is no indication of a receivable due from the sale of an Iranian business.

Petitioners' Tax Return Preparers

Petitioner filed a Federal tax return for the first time in 1979. This joint return was prepared by Douglas Woodward, and there is nothing on the return to indicate that petitioner sold a business in that year.

Petitioners' 1981 through 1985 tax returns were prepared by the Brigante & Johnson Accountancy Corp. (Brigante & Johnson). In 1986, Brigante & Johnson split, and William J. Johnson (Mr.

Johnson), one of the partners, formed William J. Johnson & Associates (Johnson & Associates). Johnson & Associates retained petitioners' account and prepared their tax returns from 1986 through 1991.

Laura Kauls (Ms. Kauls) was employed as an accountant with Brigante & Johnson and then with Johnson & Associates. Ms. Kauls was responsible for the preparation of petitioners' tax returns from 1984 through 1986.

Bad Debt Deduction Inquiry in 1985

In 1985, petitioner claimed exemption from Federal income tax withholding on Forms W-4 that he filed with respect to his businesses (URI and Huntington Harbor). In December 1985, the office of the W-4 Technical Unit of the Internal Revenue Service (IRS) requested additional information as to why petitioner believed he did not owe any Federal income tax. Petitioners forwarded the requests to Ms. Kauls. Ms. Kauls filled out Form 6450 (Questionnaire To Determine Exemption From Withholding) and Form 6355 (Worksheet to Determine Withholding Allowances). Form 6355 indicated that petitioners expected to claim a net loss of $1 million on Form 4797 (Sale of Business Property) of their 1985 return. She forwarded these forms to petitioners for their signature on January 6, 1986.

Ms. Kauls also filled out a Tax Shelter Questionnaire on behalf of petitioners to be sent to the IRS. It is not clear

whether this document was sent with the forms mentioned above.

Attached to the Tax Shelter Questionnaire is the following

statement:

> On April 30, 1979, taxpayer sold his business, Gulf Marine
> Services, a construction and salvage company operating
> solely in the country of Iran, for $8,000,000 to an Iranian.
> * * * Two million dollars of said purchase price was
> deposited into a bank in Iran, and the remaining balance of
> six million dollars was to be paid in intervals agreed upon
> between the parties in the future, with all such future
> payments to be deposited in a bank in Iran to the taxpayer's
> account.
>
> No payments since the date of sale have been paid, although
> taxpayer has made numerous attempts to make collections on
> this note. However, due to the political and economic
> situation in Iran, it was evident in 1985 that no further
> payments on this note will ever be received by the taxpayer,
> nor will he have access to the funds previously deposited in
> the Iranian bank.
>
> Consequently, the taxpayer's loss in the business bad debt
> will decrease his personal income and no Federal income tax
> is expected to be owed for 1985.

On April 1, 1986, Ms. Kauls sent a copy of the Khossravi

appraisal to the IRS. On the basis of this appraisal, Ms. Kauls

stated that petitioners were planning on claiming a loss of $1.1

million on their 1985 income tax return.

In a letter to petitioners dated May 2, 1986, Ms. Kauls

updated petitioners on the status of their 1985 return and

requested further information. Ms. Kauls additionally stated:

> We will continue to check on the deductibility of the loss
> of your business in Iran (Gulf Marine Services) on your 1985
> tax return. However, as we discussed, you will probably not
> be allowed the deduction due to the fact that it appears you
> sold the business prior to your leaving Iran and becoming a
> U.S. resident.

Ms. Kauls met or had conversations with petitioners numerous times during 1985 and 1986 with respect to the alleged sale of GMS. According to notes that she took during these meetings and conversations, at one point petitioners told Ms. Kauls that GMS was not a corporation but a partnership and that Ammareh owned 10 percent. On another occasion, petitioners told Ms. Kauls that Mrs. Ahadpour owned 20 percent. At one time, petitioner stated that he sold the business in 1976, and on another occasion he stated that the negotiations started in 1976, but the agreement was not "drawn up or officially agreed upon until 1979."

A bad debt deduction was not claimed on petitioners' 1985 return.

Ms. Kauls left Johnson and Associates in 1988.

Collection Efforts

In 1987, petitioner asked his brother Fariborz Ahadpour (Fariborz), a legal consultant in Iran, to initiate collection efforts against Ammareh. It is not clear whether any collection efforts took place during 1987 or 1988. In early 1989, Fariborz hired Iranian attorney Naghi Izadi (Mr. Izadi) for petitioner. Petitioner granted a power of attorney to Mr. Izadi to "sue in civil and penal claims and cases".

On April 10, 1989, Mr. Izadi filed a "Legal Notice" with the Ministry of Justice of the Islamic Republic of Iran. This notice was addressed to Ammareh. In his statement, Mr. Izadi referred

to the Statement of Account and provided Ammareh 1 month in which to pay his debt to petitioner. If payment was not made, then Mr. Izadi would take legal action. Ammareh responded to this notice and stated that he had owned 50 percent of GMS and that petitioner sold the remaining 50 percent to him (which was in the name of petitioner and his sons). Ammareh also stated that he had paid petitioner $130,000 for the 50 percent he sold in 1979. Ammareh finally stated that the Statement of Account was drawn up so that petitioner could "escape the taxes of the U.S. government".[7]

On April 25, 1989, Fariborz sent a letter to petitioner stating that they had to file the claim quickly since the 10-year period of limitation was running and it has been almost 10 years since the Statement of Account was signed (April 30, 1979). Petitioners believed that there was a 10-year period of limitations for the filing of a lawsuit in pursuit of an unpaid debt. Fariborz paid the attorney's fees and requested reimbursement from petitioner. Fariborz also detailed what other attorney's fees and filing fees could be incurred if the suit was pursued.

---

[7] Another translation of this document translates this phrase as "to present to the authorities". Respondent does not agree with this translation.

Petitioner testified that he was unable to pay the fees due to lack of money, and the civil claim was not pursued any further.

## Pursuit of Criminal Action

Petitioner asked Fariborz to pursue a criminal action against Ammareh.  On June 28, 1989, petitioner gave Fariborz a power of attorney to "consider and administer the Properties of * * * [petitioner] in Iran, specially Gulf Marine Service Co. Ltd." Fariborz retained Mr. Izadi for the criminal prosecution, and Fariborz signed a power of attorney authorizing Mr. Izadi to take legal actions with respect to petitioner's "said properties".

On March 26, 1991, Fariborz and Bahman presented a complaint against Ammareh for a criminal action.  Petitioner testified that he pursued a criminal action because he wanted to protect his business reputation in Iran.  In their complaint, Fariborz and Bahman claimed that they were equity owners of GMS and that Ammareh, also one of the equity owners, took all the books, records, and documents belonging to GMS and the other equity owners, and he had prevented access to them.  They requested pursuit of the matter and delivery of the books and records.

On May 26, 1991, petitioner hired two attorneys to pursue and continue the criminal prosecution of Ammareh.  On December 8, 1991, one of the attorneys, Abdolmajid Zargar (Mr. Zargar), filed a complaint with the public prosecutor.  In this complaint Mr.

Zargar stated that the Statement of Account referred to an agreement between the parties in 1976 solely for the purpose of preventing the revolutionary organizations from taking control of GMS's property.  Mr. Zargar pleaded that Ammareh be "prosecuted for misuse of billions of rials of * * * [petitioner's] assets".

On January 16, 1993, Mr. Zargar sent petitioner a letter summarizing the latest events.  The Tehran Public Prosecutor's office released the criminal case file because they thought that it was more of a civil matter.  The case was transferred to the Abadan[8] Public Prosecutor's office, where it was examined.  This office summoned Ammareh to come in and produce his assets, but he did not comply, and he was arrested and placed in jail.  It is not clear what next happened with respect to the case.

In 1996, Bahman filed a declaration with the Ministry of Justice of the Islamic Republic of Iran to discharge and expel powers of attorney held by Ammareh with respect to GMS.  The complaint further directed Ammareh to return all documents related to GMS within 48 hours of receipt of the complaint.  Ammareh filed a response to the complaint and stated that all interests, shares, benefits, and ownership of GMS had gradually been transferred to him.  Therefore, petitioner could not make any demands of Ammareh since he no longer had any interest in the business.

---

[8]  Abadan is a city located near Khorramshahr.

Petitioners' 1989 Return

Merrietta Fong (Ms. Fong), a certified public accountant employed by Johnson & Associates, was the preparer of petitioners' 1989 tax return. Ms. Fong was aware of the ongoing discussion regarding the deductibility of the claimed business bad debt. Ms. Fong saw some documentation, but she does not recall the exact documents.

Petitioners claimed an $8 million business bad debt deduction on their 1989 return. On an attachment to the return is a statement that the "business bad debt relates to sale of assets from Gulf Marine Services in prior year." The gross sales price was $8 million with a "cost or other basis" of zero.

Mr. Johnson signed petitioners' 1989 return as the preparer. The $8 million deduction claimed on the 1989 return was his decision and was based on inquiries and review of the situation over several years. Mr. Johnson was told that there was no longer any ability to collect on the debt because the Iranian period of limitations had run on collectability.

Petitioners were out of the country at the time that the 1989 return was due. Tony Thomas (Mr. Thomas), a certified public accountant at Johnson & Associates, signed petitioners' return under a power of attorney.

Mailing of the 1989 Return

Petitioners had been granted extensions to file their 1989 return by October 15, 1990. On the first Form 4868, Application for Automatic Extension of Time To File U.S. Individual Income Tax Return, that was filed, petitioners estimated their total tax liability to be $3,128.

Mr. Thomas signed petitioners' return on October 15, 1990, before the last returns went to the post office that day. After the return was signed, the return went through the firm's normal process of going into a batch with other returns that were to be mailed on that day.

Johnson & Associates customarily uses a "Tax Routing Sheet" to route tax returns through the office. This form indicates what had been done to the return, by whom, and when. Ms. Fong marked her initials and the date in the boxes for "Interviewer" and "Preparer". The tax manager of the tax department marked his initials and the date in the boxes for "Reviewer" and "Final return reviewed". Mr. Johnson marked his initials and the date of October 15, 1990, in the box "Return to be signed by". The remaining blocks for "Tax Dept. Log Out", "Mail to taxpayer", "Delivery", and "Pickup" are blank, and Mr. Thomas stated that they should have been filled in.

Petitioners' return is stamped as received by the IRS's Fresno, California, office on October 25, 1990. There is no evidence of a postmark or receipt for a certified mailing.

Petitioners' 1990 Return

Petitioners claimed a net operating loss carryover of $5,011,913 on their timely filed 1990 return. This was the portion of the claimed $8 million loss that was not used in 1989. The return was signed by Mr. Johnson as preparer.

Petitioners claimed a deduction of $30,000 for legal fees and expenses allegedly paid to Fariborz during 1990. Petitioners provided documents evidencing the following: (1) That petitioner transferred $5,000 (total charge of $5,025 including fees) to Fariborz's Iranian bank account (through Melli Bank of Iran in Los Angeles) on June 15, 1990; and (2) petitioner signed two checks drawn on the Huntington Harbor account for $5,000 each payable to Fariborz dated August 20 and November 14, 1990.

Petitioners did not provide any bills, receipts, or other documentation which would detail what these amounts were used to pay. Mrs. Ahadpour testified that these amounts were for Fariborz' expenses in connection with the criminal prosecution of Ammareh.

Petitioners' 1991 Return

Petitioners claimed a net operating loss carryover of $4,755,114 related to the claimed bad debt loss in 1989.  The return was signed by Mr. Johnson as preparer.

a. Legal Fees

Petitioners claimed a deduction of $30,025 for legal fees and expenses allegedly paid to Fariborz during 1991.  Petitioners provided documents evidencing:  (1) A transfer from petitioner to Fariborz's Iranian bank account of $25,000 ($25,040 with fees) dated May 25, 1991; and (2) two cashier's checks to the Melli Bank of Iran, one for $10,000 dated May 21, 1991, and the other for $15,000 dated May 23, 1991.[9]

Petitioners did not provide any bills or invoices to detail what these amounts were used to pay.

b. Filing of the 1991 Return

Petitioners were granted extensions to file their return on October 15, 1992.  Petitioners signed their return on October 15, 1992, and the return is stamped "Received" by the IRS on October 22, 1992.  Petitioners provided a "Domestic Return Receipt" which shows that the IRS received the return on

---

[9]  Also provided is a receipt from Wells Fargo Bank showing that Huntington Harbor sent a cashier's check to Melli Bank of Iran and was charged $5,025 on Apr. 15.  It is not clear from the document whether the date is 1990 or 1991, and petitioners could not recall the actual year.

October 20, 1992. There is no evidence of a postmark or other evidence of the date the return was mailed.

## Discussion

### Preface

The record in this case is voluminous, complex, and confusing, consisting of over 500 exhibits, many of which are in Persian with attached English translations. Occasionally, there are two translations to a document or part thereof, as the parties could not agree to the translations. There are hundreds of pages of testimony and seven expert witness reports.

### Evidentiary Issues

As a preliminary matter, before discussing the bad debt issue, we must address evidentiary objections raised by the parties.

#### A. Section 982

Prior to the trial in this case respondent filed four motions in limine to exclude certain evidence under section 982. Respondent made a continuing objection under section 982 during trial, and the Court directed the parties to argue the issue on brief. After the trial, respondent withdrew any objections under section 982.

B. Exhibits 1-P, 13-P, 14-P, and 16-P

Exhibit 1-P is the declaration with the Ministry of Justice of the Islamic Republic of Iran to discharge Ammareh's powers of attorney.[10]  Respondent objected on the basis of hearsay.

Exhibit 16-P is the letter petitioner received from the Revolutionary Moslem Group in Iran to which respondent objected on the basis of authenticity, hearsay, and completeness.

Exhibits 13-P and 14-P are the documents sent to petitioner by his Iranian attorney in 1980 to which respondent objected on the basis of completeness, hearsay, and authenticity.

We overrule respondent's objections and admit these documents into evidence.

Petitioners' Contentions

Petitioners contend that they should be allowed a bad debt deduction of $8 million that arose from the sale of GMS in 1976. Apparently, petitioners argue that GMS was a corporate entity that was simply an empty shell for estate planning purposes to which petitioner would eventually transfer his assets and ultimately distribute them upon his death.

Petitioners also contend that the Statement of Account memorialized the 1976 agreement and that they made efforts to

---

[10]  Respondent also charged that Ammareh's signature on this document appeared to be a forgery.  The parties agreed to have the document examined by an expert, though no followup report was ever submitted.  Accordingly, we reject respondent's charges.

collect on the debt. Petitioners further contend that in 1989 the debt became worthless because the time within which to collect under the 10-year Iranian period of limitations on collection of this debt had expired.

Respondent's Contentions

Respondent first contends that no sale occurred giving rise to any debt. It is respondent's view that petitioner disposed of his interest in GMS and was fully paid by Ammareh. According to respondent, the alleged $8 million sale was rigged to enable petitioner to avoid paying American taxes. Respondent alternatively contends:

a. Any sale between petitioner and Ammareh took place in 1979 after petitioner had established residency in the United States. Therefore, petitioner failed to report any gain on the sale and is limited (if there is a bad debt) to his basis in the assets (which petitioner has not proven) or in his shares of stock of GMS (at best $10,000).

b. GMS was a corporation owned in part by petitioners and any sale of the "business" to Ammareh was either at the corporate level (i.e., GMS sold its business to Ammareh) or a sale of shares of stock from petitioner to Ammareh.

c. Finally, respondent contends that petitioner has failed to prove when any alleged debt became worthless, arguing that any such debt had been worthless long before the years at issue.

Respondent disputes whether Islamic law (which became more pronounced after the establishment of Islamic Republic) recognized the 10-year period of limitations pursuant to the Iranian Commercial and Civil Codes upon which petitioners claim they relied.[11]

We find it unnecessary to consider all of these contentions because, even if we viewed the facts most favorably to petitioners (which we do not), petitioners cannot prevail.

Bad Debt Deduction

Section 166(a) provides that there shall be allowed as a deduction any debt which becomes worthless within the taxable year. A taxpayer is not entitled to a deduction for a worthless debt under section 166 in connection with an income item unless it has been included in the taxpayer's gross income for Federal income tax purposes either for the year for which the deduction is claimed or for a prior year. See Gertz v. Commissioner, 64 T.C. 598, 600 (1975); Garrison v. Commissioner, T.C. Memo. 1994-200, affd. without published opinion 67 F.3d 299 (6th Cir. 1995); sec. 1.166-1(e), Income Tax Regs. Petitioners never included the account receivable for the sale of GMS in their income. Therefore, petitioners are not entitled to a bad debt deduction because Ammareh defaulted.

_____

[11] Islamic commentators proclaimed that limiting the time to make rightful claims is against Islamic principles.

Petitioners claim that this section does not apply to them since the business was sold in 1976 when they were not residents of the United States and not required to file a 1976 tax return. We addressed a similar issue in Antuna v. Commissioner, T.C. Memo. 1970-290, where we held that the taxpayer was not entitled to a bad debt deduction resulting from a Cuban expropriation of an account receivable. The taxpayer could not establish that he had previously reported the account receivable as income on either his Cuban or his U.S. tax return. In a footnote to this opinion we stated:

> We need not decide whether inclusion of an item in a foreign income tax return furnishes a basis for purposes of the bad debt * * * provisions, as does inclusion in a United States income tax return. Since petitioner has failed to establish the contents of his return, we do not reach this question. [Id.]

Petitioner admitted that the gain (or loss) from the sale of GMS to Ammareh was not reported on any U.S. or Iranian tax return. Therefore, petitioner does not have a basis in the claimed bad debt. Accordingly, petitioners are not entitled to a bad debt deduction for 1989 nor any carryovers of net operating losses. Respondent is sustained on this issue.

Deduction of Legal Expenses

Section 162 allows a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business. Section 212 allows an individual to deduct all of the ordinary and necessary expenses paid or incurred in connection with (1)

the production of income, (2) the management, conservation, or maintenance of property held for the production of income, or (3) the determination, collection, or refund of any tax.  Taxpayers must keep sufficient records to establish deduction amounts.  See sec. 6001.

Whether a litigation expense is deductible depends on the origin and character of the claim for which the expense was incurred and whether the claim bears a sufficient nexus to the taxpayer's business or income-producing activities.  See Woodward v. Commissioner, 397 U.S. 572 (1970); United States v. Gilmore, 372 U.S. 39, 44-45 (1963).  Ordinary and necessary litigation costs are generally deductible under section 162(a) when the matter giving rise to the costs arises from, or is proximately related to, a business activity.  See Woodward v. Commissioner, supra; Kornhauser v. United States, 276 U.S. 145, 153 (1928).  Litigation costs must be "attributable to a trade or business carried on by the taxpayer" in order to be deductible as a business expense.  Sec. 62(a)(1); see Guill v. Commissioner, 112 T.C. 325 (1999).

The ascertainment of a claim's origin and character is a factual determination that must be made on the basis of the facts and circumstances of the litigation.  See United States v. Gilmore, supra at 47-49.  The most important factor to consider is the circumstances out of which the litigation arose.  See

Guill v. Commissioner, supra; Boagni v. Commissioner, 59 T.C. 708 (1973). In passing on this factor, the fact finder must take into account, among other things, the allegations set forth in the complaint, the issues which arise from the pleadings, the litigation's background, nature, and purpose, and the facts surrounding the controversy. See Guill v. Commissioner, supra; Boagni v. Commissioner, supra at 713.

During 1990 and 1991, petitioners sent $30,000 and $30,025, respectively, to Fariborz allegedly for legal expenses in relation to the criminal prosecution of Ammareh. Petitioners argue that, although they could no longer pursue a civil action against Ammareh, they sought criminal prosecution of Ammareh in order to protect petitioner's business reputation. Petitioner wanted to show that a fraud would not be committed upon him. Petitioners claim these deductions on their Schedule C for Huntington Harbor.

Respondent contends that the legal expenses are not deductible on petitioners' Schedule C for Huntington Harbor because the legal expenses were in pursuit of a criminal matter and these expenses paid to Fariborz were not ordinary and necessary expenses of Huntington Harbor nor were they incurred in the production of income.

It is not clear whether petitioner was seeking to protect his business reputation in Iran, in the United States, or both.

In any case, we find petitioners' assertion implausible. Petitioners have not shown why patrons of Huntington Harbor would know or care about the pursuit of a criminal prosecution against Ammareh in Iran. Petitioners have not demonstrated how the pursuit of that criminal matter was necessary to protect petitioner's business reputation in connection with Huntington Harbor. Additionally, it does not appear that petitioner was going to engage in any future business endeavors in Iran. Given the circumstances in the past, it seems doubtful that he would want to or would be able to do so.

Accordingly, petitioners are not entitled to deductions for the legal expenses since they failed to show how these expenses were necessary to protect petitioner's business reputation with respect to Huntington Harbor or any other business undertaking.

Accuracy-Related Penalty

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the underpayment of tax attributable to one or more of the items set forth in section 6662(b). Respondent asserts that the underpayment of petitioners' tax was due to negligence or intentional disregard of rules or regulations, sec. 6662(b)(1), and to a substantial understatement, sec. 6662(b)(2).

Petitioners bear the burden of proving that respondent's determination is erroneous. See Rule 142(a); Axelrod v. Commissioner, 56 T.C. 248, 258-259 (1971).

Negligence includes a failure to make a reasonable attempt to comply with the provisions of the internal revenue laws. See sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence has also been defined as a lack of due care or failure to do what a reasonable person would do under the circumstances. See Norgaard v. Commissioner, 939 F.2d 874, 880 (9th Cir. 1991), affg. in part and revg. in part on other grounds T.C. Memo. 1989-390; Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989). "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. See sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

There is a substantial understatement of income tax if the amount of the understatement for the taxable year exceeds the greater of (1) 10 percent of the tax required to be shown on the return or (2) $5,000. See sec. 6662(d)(1)(A). For purposes of section 6662(d)(1), "understatement" is defined as the excess of tax required to be shown on the return over the amount of tax that is shown on the return reduced by any rebate within the meaning of section 6211(b)(2). See sec. 6662(d)(2)(A). Any understatement is reduced by the portion of the understatement attributable to an item for which there is substantial authority for the treatment by the taxpayer or where the relevant facts affecting the item's tax treatment are adequately disclosed in

the return or in a statement attached to the return. See sec. 6662(d)(2)(B).

The accuracy-related penalty does not apply with respect to any portion of the underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith. See sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and reliance on the advice of a professional, such as an accountant. See sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners contend they had a good faith belief that they were entitled to take the $8 million bad debt deduction on their 1989 tax return based on discussions with their return preparers. They claim that they relied on the professional advice of the preparers, and the decision to take the deduction was Mr. Johnson's. Petitioners further contend that they disclosed all relevant facts to the preparers.

Generally the duty of filing accurate returns cannot be avoided by placing the responsibility on a tax return preparer. See Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). While hiring an attorney or accountant does not insulate the taxpayer from negligence penalties, good faith reliance on

professional advice concerning tax laws is a defense. See <u>United States v. Boyle</u>, 469 U.S. 241 (1985); <u>Betson v. Commissioner</u>, 802 F.2d 365, 372 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-264. Reliance on a qualified adviser may demonstrate reasonable cause and good faith if the evidence shows that the taxpayer contacted a competent tax adviser and provided the adviser with all necessary and relevant information. See <u>Collins v. Commissioner</u>, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. <u>Dister v. Commissioner</u>, T.C. Memo. 1987-217; <u>Jackson v. Commissioner</u>, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). In order to prove such reliance, the taxpayer must establish that the return preparer was supplied with all necessary information, and the incorrect return was the result of the preparer's mistakes. See <u>Weis v. Commissioner</u>, 94 T.C. 473, 487 (1990).

Both Ms. Fong, who prepared petitioners' 1989 return, and Mr. Johnson, who signed as the tax preparer, believed that petitioner was the sole proprietor of GMS. Petitioners told Mr. Johnson that the period of limitations had run on collectability of the debt, and they showed him the Statement of Account as support of the debt. Mr. Johnson relied on this information provided by petitioners in determining whether petitioners were entitled to claim the bad debt. Mr. Johnson never saw the fair price agreement, and he testified that if the real agreement

between petitioner and Ammareh were the fair price agreement, it would have changed his decision to claim the deduction on the return. Ms. Fong did not recall whether she ever saw the fair price agreement, but she thought she had seen a note.

Petitioners had been giving different versions about the ownership of GMS since 1985 when it was first brought to Ms. Kauls' attention for the preparation of their 1985 return. Petitioners told Ms. Kauls that GMS was a corporation and then retracted that statement and told her it was a partnership in which Mr. Ammareh owned 10 percent.[12] We note that the latter is contrary to petitioners' current position. At another time, petitioners told her that Mrs. Ahadpour owned 20 percent of the business. It appears that in the end, Ms. Kauls relied on the Statement of Account and the Khossravi appraisal when she reported to the IRS that petitioner had sold his business.

Petitioners have failed to establish that they relied reasonably and in good faith on any advice given by their preparers. Petitioners have not shown that they acted in good faith and had reasonable cause with respect to the bad debt. It is evident that the preparers were aware of the debt only from the Statement of Account and petitioners' statements. Lastly, it is not clear whether petitioners discussed whether the sale of

---

[12] Ms. Kauls left Johnson & Associates in 1988, 2 years before the 1989 return was filed.

GMS had been reported on any prior return. Petitioners have failed to show that there was full disclosure.

Petitioners have failed to carry their burden in proving good faith reliance on their preparers. Therefore, we sustain respondent's imposition of the accuracy-related penalties for all years at issue.

Addition to Tax for Delinquency

Respondent determined that petitioners are liable for each of the years 1989 and 1991 for the addition to tax under section 6651(a)(1) because they failed to file timely their Federal income tax return for each year.

In the case of failure to file an income tax return on the date prescribed for filing, section 6651(a)(1) imposes an addition to tax equal to 5 percent of the amount required to be shown on the return, with an additional 5 percent to be added for each month or partial month during which such failure continues, not to exceed 25 percent in the aggregate.

Petitioners' 1989 return was due on April 15, 1990, but petitioners received an automatic 4-month extension through the filing of Form 4868. In August 1990, petitioners sought and received an additional 2-month extension to October 15, 1990, through the filing of Form 2688. Petitioners' return was stamped as received by the IRS on October 25, 1990. Petitioners' 1991 return was due on April 15, 1992, but they filed Forms 4868 and

2688 and received the two extensions for a due date of October 15, 1992. Petitioners' return was stamped as received by the IRS on October 22, 1992.

Specifically, respondent contends that petitioners failed to file timely those returns because petitioners' respective applications for automatic extension for those years were invalid; therefore, petitioners are liable for the addition to tax of the full 25 percent.

A taxpayer's application for automatic extension is not valid if it does not comply with the requirements set forth in section 1.6081-4(a), Income Tax Regs. One of the requirements set forth in that section is that the application must show a proper estimation of the taxpayer's tax liability for the taxable year. See sec. 1.6081-4(a)(4), Income Tax Regs. The failure to estimate properly the final tax liability on Form 4868 can invalidate the automatic extension and subject the taxpayer to an addition to tax pursuant to section 6651(a)(1) for failure to timely file the return. See Crocker v. Commissioner, 92 T.C. 899, 910 (1989). Nevertheless, the mere fact that petitioners underestimated their income tax liability is insufficient to conclude that the estimate was improper. See id. at 906.

A taxpayer will be treated as having "properly estimated" his tax liability when he or she makes a bona fide and reasonable estimate of his or her tax liability based on the information

available at the time he or she makes the request for an extension. Id. at 908. As a prerequisite for this treatment, however, the taxpayer must make a bona fide and reasonable attempt to locate, gather, and consult information which will enable him or her to make a proper estimate of his or her tax liability. See id.

Petitioners' taxes were estimated at $3,128 and $8,000 for 1989 and 1991, respectively. These amounts were estimated by petitioners' accountants, and these were the amounts that the accountants believed to be due for 1989 and 1991. It is the taxpayer's obligation to supply his or her accountant with complete and accurate records from which to make a reasonable estimate of tax liability. See Estate of Duttenhofer v. Commissioner, 49 T.C. 200, 205 (1967), affd. per curiam 410 F.2d 302 (6th Cir. 1969).

Petitioners did not provide all of the necessary information to their accountants in order for them to determine a reasonable estimate of petitioners' tax liability. In the previous section of this opinion, we held that petitioners were negligent in claiming the bad debt deduction and that they did not reasonably rely on the advice of their accountants because they withheld important information. It follows that petitioners did not make a bona fide and reasonable estimate of the tax liabilities by relying on their accountants. Thus, we conclude that petitioners

did not properly estimate their 1989 and 1991 tax liabilities, the extension requests were not valid, and the 1989 and 1991 returns were not timely filed.  Therefore, we hold that petitioners are liable for the additions to tax for delinquency under section 6651(a)(1) for 1989 and 1991.[13]

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[13]  The parties also argued whether petitioners' returns were timely filed, i.e., postmarked on or before the due dates of the returns.  Because petitioners' extension requests were not valid, we need not address this issue.